THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LILAH MAE ALLEN, Appellant.

First Department, April 4, 1978

## APPEARANCES OF COUNSEL

*Walter H. Curchack* of counsel *(Rubin Baum Levin Constant & Friedman,* attorneys), for appellant.

*Edward G. Spell* of counsel *(Alan D. Marrus* with him on the brief; *Mario Merola, District Attorney),* for respondent.

**OPINION OF THE COURT**

Sullivan, J.

The only issue of concern on this appeal from defendant's conviction of the crime of manslaughter in the first degree (Penal Law, § 125.20) is the sufficiency of the evidence, which was exclusively circumstantial. We find that the facts adduced at trial were sufficient for the jury to conclude that they excluded to a moral certainty every reasonable hypothesis of innocence and that guilt was established beyond a reasonable doubt.

Defendant Lilah Mae Allen, and Fred Watson, along with an unidentified male, left a poolroom in the early afternoon of September 3, 1974. Watson was seen shortly thereafter in the lobby of defendant's apartment building, intoxicated. The police had to be called. When they arrived, they removed him from the premises and placed him on the stoop in front of the building. Soon afterwards defendant was seen arguing with Watson in front of the door to her apartment which was located on the third floor. One witness heard Watson banging on defendant's door, saying "let me in, Lilah, let me in." She heard defendant answer "get away from my door." At one time another witness observed defendant pulling Watson by his coat lapels into the apartment.

At 5:30 that evening another tenant saw Watson inside the building and a few minutes later that same tenant, defendant's next-door neighbor, heard Watson knocking at defendant's door. This tenant told Watson, who she believed had been drinking, that she did not believe defendant was at home. Watson, however, thinking otherwise, stated that "she's in there". After being persuaded by the neighbor to leave, Watson walked towards the stairs. At about this same time, testified to as between 5:45 and 6:15 P.M., another tenant heard defendant arguing heatedly over $2 with a male on the third floor. At about six o'clock blood was discovered by the next-door tenant outside defendant's door. The tenant followed the trail of blood to the landing between the second and third floor where Watson's body was found. This witness identified the body as that of the man she had seen at defendant's door earlier and whom she believed she had persuaded to leave.

At autopsy, the cause of death was determined to be a single stab wound in the chest.

The police were summoned. They knocked at defendant's

apartment door but received no response. An officer was posted to guard the body. At about 11 o'clock that night, two neighbors talking to a detective heard defendant from inside her apartment reviling them for talking to the police. Several days after the homicide, defendant's apartment was sealed by the building administrator.

Defendant was not seen again in or around the building until two and one-half months later when neighbors saw her trying to re-enter the apartment. Up until this incident defendant had lived in the apartment continually for a period of two or three years. The police were summoned and when they arrived they found defendant lying drunk in front of the building. She did not respond to any questions but after the officers placed her in the police car she blurted out, laughing: "I know why you got me for, because of Fred." Subsequent inculpatory statements were made in the same outburst but in a pretrial *Huntley* hearing the trial court ruled these statements inadmissible at trial because of the failure of the police to advise defendant of her *Miranda* rights. Concededly, the blurt-out as to "Fred" was equivocal, at best, and we attach no significance to it in our evaluation of the People's evidence.

Taken as a whole the evidence is sufficient to support a jury verdict of guilty. Several times in the afternoon Watson was placed in or near defendant's apartment, one time only minutes before he was found dead in a pool of blood with a trail leading to defendant's apartment door. In the span of time between the moment the last person saw Watson alive on the third floor and the discovery of his body on the staircase landing, defendant was heard arguing with a male on the third floor. There was no evidence that Watson argued with anyone else in the building at or about the time of the homicide. Indeed, the only other person to have contact with Watson at that time, i.e., the next-door tenant who saw Watson knocking at defendant's door, testified that he listened to her entreaties and headed toward the staircase, despite his belief that "she's in there." On these facts the inescapable conclusion for the trier of the facts was that defendant, angered and provoked by the importunate Watson, stabbed him in a culminating confrontation and that no other reasonable hypothesis existed.

In testing the sufficiency of circumstantial evidence, the Court of Appeals has stated that the hypothesis of guilt should "flow naturally from the facts proved, and be consistent with

them all". *(People v Borrero,* 26 NY2d 430, 434.) The court further stated, however, that the test "should not be a substitute for reasoned ·thought." (P 435.) "In the end, it is a question whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the established facts." *(People v Wachowicz,* 22 NY2d 369, 372.) Here, the jury weighed all the evidence and determined that the proven facts were consistent with defendant's guilt and inconsistent with his innocence. *(People v Harris,* 306 NY 345.) "We assume that the jury credited the prosecution witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded it." *(People v Benzinger,* 36 NY2d 29, 32.)

In *People v Lagana* (36 NY2d 71, 74), the Court of Appeals upheld a conviction where the People had established motive, placed the defendant at the scene of the crime at the time of the shooting, supported the conclusion that the defendant fired the fatal shots, and demonstrated the defendant's flight from the scene. The events of the afternoon involving defendant and Watson₀presented a motive, the witnesses' testimony placed defendant at the scene, the tell-tale trail of blood led to her door, and, finally, her refusal to open the apartment door, combined with her disappearance from the building for over two months pointed to flight and the inference of consciousness of guilt. "In the absence of explanation, the fact of departure and absence may in the light of surrounding circumstances permit inference of flight and be significant of consciousness of guilt." *(People v Stilwell,* 244 NY 196, 199.)

We see no logical gaps in the proof offered and find that the jury drew no unwarranted conclusions based on probabilities of low degree. (See *People v Cleague,* 22 NY2d 363, 367.) The evidence was sufficient to compel the finding that Lilah Mae Allen stabbed and killed Fred Watson.

Accordingly, the judgment of Supreme Court, Bronx County (ZIMMERMAN, J., at trial and sentence, WARNER, J., at suppression hearing), rendered February 27, 1976, convicting defendant, after jury trial, of the crime of manslaughter in the first degree and sentencing her to an indeterminate term of from 4 to 12 years' imprisonment should be affirmed.

SANDLER, J. (dissenting). The central issue presented on the defendant's appeal from a judgment of conviction for manslaughter in the first degree following a jury trial is whether the evidence, entirely circumstantial in character, is legally

sufficient to exclude every reasonable hypothesis consistent with innocence. Although the legal issue presented seems to me close, I am persuaded that the evidence falls short of that required to sustain the conviction.

The evidence, consisting in part of snippets of information from varied witnesses with considerable lack of precision as to chronology and time, is as follows:

Some time during the early afternoon of September 3, 1974, the defendant, the deceased, Fred Watson, and a third person met at a poolroom which, after a period of time, they left together.

Between 12:30 and 2:30 P.M. on that day, several tenants residing at 1314 Prospect Avenue in The Bronx, heard the defendant arguing with a man wearing a black jacket in front of her third floor apartment. The man apparently pleaded to be allowed to enter; the defendant ordered him away; and the argument concluded with the defendant grabbing the man, who was apparently intoxicated, by his lapels and pulling him into her apartment. Early in the same afternoon the deceased, wearing a black jacket and highly intoxicated, was observed loitering in the lobby of the same building. The superintendent, unable to budge the deceased from his position, called the police who subsequently removed him from the interior of the building and placed him on the front stoop.

At 5:30 that evening, a third floor tenant of the building, observed the deceased first loitering inside the building and later knocking on the defendant's door asking to be permitted inside. There was no response from within the defendant's apartment. The witness told the deceased that the defendant was not at home to which he responded "She's in there." After some coaxing by the tenant, he started to walk downstairs. A few minutes later a first floor tenant of the building heard the defendant arguing with someone on the third floor.

At six o'clock a third floor tenant observed blood stains in front of defendant's apartment door and followed a trail of blood to the third floor staircase where she saw the deceased lying in a pool of blood. The police were promptly notified and the officers who arrived followed the trail of blood which came to an end in front of defendant's apartment.

Some time later that evening a detective knocked on defendant's apartment door and received no response. Thereafter, while the detective was conferring with two third floor tenants concerning the defendant, the tenants heard the defendant

cursing at them from within her apartment, testimony not confirmed by the detective.

The defendant was not observed in or about her apartment during the next several days, after which her apartment was nailed shut on the orders of the administrator of the building.

Some two and one-half months thereafter, defendant in an intoxicated condition, sought entry to her apartment. The police were summoned, found the defendant drunk on the sidewalk, and placed her in a police car. On entering the car, defendant, laughing and cursing, said "You got me because of Freddie."

The autopsy disclosed that the deceased died from a single stab wound of the chest.

Piecing together the significant aspects of the testimony, the following seems to me to have been established.

1. The deceased died as a result of a stab wound inflicted in front of the defendant's apartment.

2. The defendant was heard arguing with an unknown person on the third floor some 20 to 30 minutes before discovery of the body of the deceased.

3. The deceased had been seeking entry into the defendant's apartment during the day, which had annoyed her, and suggests the possibility that another attempt might have provoked an angry response.

4. The defendant's departure from her apartment the following day and for a period of time thereafter suggests a flight and the normal inferences consistent with that.

As to the defendant's statement to the police, it seems clear that no inference adverse to her can be drawn since it is equally consistent with innocence as with guilt. The literal meaning would appear to be that the defendant was aware that she was a suspect in the homicide.

One aspect of the testimony merits additional comment. There is no direct evidence as to the identity of the person with whom the defendant was heard arguing some half hour prior to the finding of the body of the deceased. The case would clearly be strengthened, although not sufficiently in my view to sustain the conviction, if it could be inferred appropriately from the other circumstances presented that the defendant was arguing with the deceased and that supposed fact was then used to bolster the other evidence against her. In my

view that would be an unacceptable inference under long-established principles.

The rules of law controlling criminal cases based entirely upon circumstantial evidence are clear, familiar and long-standing, although their application in varying fact circumstances has been a frequent source of disagreement.

The facts from which the significant inferences are drawn must themselves have been proved and not presumed. (See, e.g., *People v May,* 290 NY 369, 371.)

As recently restated by the Court of Appeals "[F]or a conviction based exclusively upon circumstantial evidence to stand, the hypothesis of guilt should flow naturally from the facts proved and be consistent with them, and * * * the facts proved must exclude to a moral certainty every reasonable hypothesis of innocence." *(People v Lagana,* 36 NY2d 71, 73-74.)

Applying these principles to the evidence in this case, I agree that the hypothesis of guilt here flows naturally from the facts proved and is consistent with them. I do not agree that the facts proved exclude to a moral certainty every reasonable hypothesis of innocence.

The hard fact is that there is no evidence that places this defendant on the scene at the time the deceased received the fatal stab wound. Nor is there any evidence that excludes the presence of a third person from the area of the third floor hallway at the time of the fatal assault. Evidence of flight is ordinarily, of course, of slight value. *(People v Yazum,* 13 NY2d 302.)

The evidence presented, it is true, provides a basis from which one may infer the possibility of a motive for the defendant to have assaulted the deceased—hardly a circumstance of compelling weight. Moreover, the fact that there is no evidence that another may have been similarly motivated does not exclude that possibility in this case.

The deceased was intoxicated throughout the afternoon, acting in a highly aggressive manner; had resisted efforts to evict him by the superintendent of the building, who had then required police assistance; and had been the source of annoyance to another tenant in the building.

The "logical gaps" in the proof are just too substantial to permit a finding that guilt was proved beyond a reasonable doubt. *(People v Cleague,* 22 NY2d 363, 367.)

A characteristic of cases in this area is that the results turn so often on the peculiar aspects of the individual fact situations that a decision in one case, whether upholding or vacating a conviction, rarely provides direct assistance with regard to another. I have not found a case which on its facts seems to me significantly stronger than the facts presented here in which a conviction was set aside. (See e.g., *People v Benzinger,* 36 NY2d 29; *People v Davis,* 41 NY2d 678.) Nor have I found any case where the facts were clearly weaker in which the conviction [was] sustained. (See, e.g., *People v Powell,* 39 AD2d 531; *People v Vasquez,* 47 AD2d 934.)

However, a recent case in this court involved the vacating of the conviction in a fact situation that seems to me of comparable strength to that presented here, although that view is clearly subject to legitimate disagreement. In *People v Wooden* (58 AD2d 554) the defendant was walking next to a victim when one of three men following them allegedly struck the victim on the head with a blunt instrument after which the defendant and the other three promptly went through the pockets of the fallen person. It was held that the inference (certainly a substantial one) that the defendant had been acting in concert with those who assaulted the deceased from the rear with regard to the attack did not exclude to a moral certainty every reasonable hypothesis consistent with innocence.

*People v Lagana* (43 AD2d 834, revd 36 NY2d 71) although involving significantly stronger inculpatory evidence than here presented, is sufficiently close in some aspects to be instructive.

In *Lagana,* the evidence disclosed that the defendant had been in an altercation in a certain club with the deceased, was seen to leave the club, enter his car, double park it in front of the building housing the club, and to walk in front of it.

At the time the shots were fired a man in front of the double parked car, although not identified by the witness, was seen to have his hand extended in a manner consistent in time and circumstances with the shots. The evidence was clear that the defendant immediately fled the scene in his car, desperately seeking to evade the pursuing police officers, and that a gun was found on the route of his flight, not definitively linked with the bullets that had been fired, but the bullets of which bore similar markings.

The determination of the Court of Appeals that the evidence

was sufficient to sustain the conviction is clearly not dispositive here since the evidence of guilt in *Lagana* was more impressive than here. Thus, the defendant was placed at the scene at the time of the actual shooting; the motive was clear; the flight was dramatic and immediate; and a substantial basis for culpable inference was present in the finding of a gun on the path of his flight, the bullets of which were marked in a similar fashion to those that had been fired during the homicidal assault. It is surely pertinent that on these significantly more compelling facts, the Appellate Division had concluded that the evidence was legally insufficient.

For the reasons stated above, the judgment of conviction should be reversed and the indictment dismissed.

KUPFERMAN, J. P., LUPIANO and YESAWICH, JJ., concur with SULLIVAN, J.; SANDLER, J., dissents in an opinion.

Judgment, Supreme Court, Bronx County, rendered on February 27, 1976, affirmed.